UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFF A. HAWKINS, | No. C 08-1482 MHP (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| R. HOREL, Warden, | |
| Respondent. | (Docket No. 15) |

# INTRODUCTION

This is a federal habeas corpus action filed by a state prisoner pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the petition is DENIED.

# BACKGROUND

In 2005, an Alameda County Superior Court jury found Petitioner guilty of, <u>inter alia</u>, attempted murder.[1] The trial court sentenced Petitioner to thirty years to life in state prison.[2] The California Court of Appeal for the First Appellate District affirmed the judgment. (Ans., Ex. B at 1.) The California Supreme Court denied his petitions for review and writ of habeas corpus. (<u>Id.</u>, Exs. C & D.)

Evidence presented at trial showed that in 2004 Petitioner attacked the victim, King Ninety, with a baseball bat. The state appellate court summarized the facts as follows:

On April 18, 2004 at approximately 6:30 a.m., Oakland police were dispatched to a home at 1050 37th Street in Oakland (the Home). There, police found a man later identified as King Ninety sitting on a mattress on a bedroom floor, his face and the room covered with blood. Police found parts of a wooden baseball bat on the bed and another piece with blood on it protruding from under a couch. Ninety had a "large [h]ole in the center of his forehead," through which police could see "either his skull or brain." He was transported to a hospital.

[Petitioner] had been staying at the home of his friend Lamar Brooks for approximately four months prior to the incident. Brooks shared the Home with Simul Linscomb (Simul), Eddie Linscomb (Eddie) and King Ninety. On April 17, [Petitioner] had a "slow" or "medicated" look about him, and was acting a "little" strangely. [Petitioner] poured half a gallon of turpentine on the floor of the Home, explaining that it was "air freshener." Simul directed him to leave.

Simul returned home from work later that day, and found [Petitioner] watching a movie with King Ninety and Eddie. Simul went to bed, but was awakened later by Brooks, who told him that [Petitioner] "did something." Simul saw [Petitioner] in the living room holding a bloody baseball bat handle. [Petitioner] calmly told him that King Ninety "shot him years ago." Simul grabbed the bat handle and forced [Petitioner] out the door.

. . . .

Oakland Police Sergeant Mark Dunakin questioned [Petitioner] at the police station. [Petitioner] was calm at the outset, but became "agitated and appeared hostile" once he was questioned about the incident. He conducted a taped interview of [Petitioner], which was played for the jury. In the taped statement, [Petitioner] denied knowing King Ninety, denied staying at the Home, denied having a baseball bat, and denied having blood on his pants. When Sergeant Dunakin said that the stains looked like blood, [Petitioner] stated he might have fallen in the bushes, or the blood could be due to an infection he had. He told police he had spent the night at his Aunt Tootsie's house. He denied hitting King Ninety with a baseball bat, saying it was not him and that he did not know anything. [Petitioner] also denied any knowledge of his claim that King Ninety had shot [Petitioner] in the past.

Sergeant Dunakin took a videotaped statement from Brooks on April 18. Brooks told him that after being awakened the previous night, he saw [Petitioner] standing by the bedroom door holding a piece of bloody baseball bat. [Petitioner] told Brooks that he had a "call" telling him that Ninety was responsible for shooting him 10 years earlier. Brooks thought [Petitioner] had "relapsed," but did not see him using any controlled substances on April 17 or 18. At trial, Brooks denied telling police he saw [Petitioner] standing at the bedroom door with a piece of bloody bat.

Blood found on the sweatpants [Petitioner] was wearing and on the pieces of broken bat was subjected to DNA analysis. The samples of blood from both the sweatpants and the bat matched the DNA profile found in [Petitioner]'s blood. Shannon Cavness, a DNA analyst for the Oakland Police Department, testified to her expert opinion that the chance of any other person having the same profile was "less than one in 1.6 quadrillion."

> [Petitioner]'s defense was that he did not form the specific intent necessary for attempted murder or aggravated mayhem, and that he was legally insane at the time of the offense. The court appointed two psychologists to evaluate [Petitioner]. Dr. Marlin Griffith, reviewed [Petitioner]'s medical records, the police report, and the preliminary hearing transcript, and interviewed [Petitioner] on June 24, 2005. [Petitioner]'s medical records indicated that he was first diagnosed with paranoid schizophrenia in 1999. [Petitioner] also was a cocaine addict, and had left a drug treatment program a few days prior to the incident. Dr. Griffith testified that cocaine can cause paranoia and exacerbate a psychotic condition. [Petitioner] told Dr. Griffith that he did not recall the incident, and was in a "transitional or black out" state. Dr. Griffith opined that [Petitioner] suffered from chronic paranoid schizophrenia, and that he experienced an acute episode of paranoid schizophrenia on April 17 and 18. He testified that the certainty of his opinion, on a 10-point scale, "with ten being certainty, I would certainly say eight on the ten[-]point scale." Dr. Griffith did not administer any psychological tests, nor did he consider [Petitioner]'s taped statement made to the police.
>
> Dr. Henry Hoey, also a psychologist, interviewed [Petitioner] in June 2005 and reviewed his records. [Petitioner] "did not have a memory" of the incident, other than standing in a doorway with a baseball bat. Dr. Hoey also opined that [Petitioner] was suffering from paranoid schizophrenia, and that [Petitioner] was "legally insane at the time of the offense." Dr. Hoey believed [Petitioner] was suffering from auditory hallucinations at the time of the offense. He testified that some people diagnosed with paranoid schizophrenia, even those suffering from an acute episode, are able to tell the difference between right and wrong. Dr. Hoey opined that [Petitioner] was unaware that he was beating Ninety with a baseball bat at the time he was doing it.

(Ans., Ex. B at 2–5) (footnotes removed). Petitioner "initially pleaded not guilty, but later changed his plea to not guilty by reason of insanity." (Id. at 2.)

As grounds for federal habeas relief, Petitioner alleges that (1) his right to due process was violated by the trial court's refusal to give requested instructions on imperfect self-defense based on a delusion; (2) his right to due process was violated by the trial court's refusal to give requested instructions on voluntary intoxication; (3) the jury instruction given on flight as evidence of guilt violated Petitioner's right to due process; (4) the imposition of the upper term sentence on the attempted murder conviction violated his Sixth and Fourteenth Amendment rights; and (5) there was insufficient evidence to support the finding that Petitioner was sane at the time he committed the crime.

3

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412–13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

**DISCUSSION**

**1. Instructions on Imperfect Self-Defense**

Petitioner claims that the trial court violated his right to due process when it refused to give requested instructions on imperfect self-defense based on a delusion. (Pet. at 6.) The

4

state appellate court rejected this claim on state law grounds. (Ans., Ex. B at 6.)

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings. See Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. See id.

Due process requires that "'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)). Therefore, a criminal defendant is entitled to adequate instructions on the defense theory of the case. See Conde v. Henry, 198 F.3d 734, 739 (9th Cir. 2000) (error to deny defendant's request for instruction on simple kidnaping where such instruction was supported by the evidence).

However, a defendant is entitled to an instruction on his defense theory only "if the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant." U.S. v. Boulware, 558 F.3d 971, 974 (9th Cir. 2009) (internal quotations omitted).

Petitioner's requested jury instruction was not legally cognizable under California law. It is true that in California, under the doctrine of "imperfect self-defense," "a defendant can seek to negate malice by introducing evidence that he or she actually, albeit unreasonably, believed it was necessary to defend himself or herself from imminent peril to life or great bodily injury." People v. Mejia-Lenares, 135 Cal.App.4th 1437, 1448 (Cal. Ct. App. 2006.) That doctrine, however, does not apply when the unreasonable belief is based on a delusion. (Id. at 1453.) "[I]mperfect self-defense remains a species of mistake of fact . . . . as such, it cannot be founded on delusion. In our view, a mistake of fact is predicated upon a negligent perception of facts, not, as in the case of a delusion, a perception of facts not grounded in reality." (Id. at 1453.) Accordingly, "imperfect self-defense cannot be based on delusion alone." (Id. at 1461.)

Accordingly, Petitioner's claim fails. Petitioner was not constitutionally entitled to such an instruction because it was not, under the authorities cited above, legally cognizable. Under such authorities, the Court DENIES Petitioner's claim.

**2.   Jury Instruction on Voluntary Intoxication**

Petitioner claims that the trial court violated his right to due process when it refused to give requested instructions on voluntary intoxication. (Pet. at 6.)

The state appellate court rejected this claim, for the reasons stated along with their description of the relevant facts:

> Here, the only evidence of voluntary intoxication was speculative. There was no evidence that the turpentine caused any "intoxication." [Petitioner] had a history of cocaine dependency, and had left a treatment program a few days before the incident. Brooks testified that [Petitioner] was acting a little strangely and had a "real like slow" look on the day of the incident. Brooks testified that he did not personally witness [Petitioner] take any drugs. He "believe[d]" [Petitioner] may have used drugs because he thought he relapsed. Brooks observed cocaine paraphernalia in the [h]ouse. Simul testified that he did not witness anyone taking drugs that night, and did not recall if anyone was drinking alcohol. There is no substantial evidence that [Petitioner] was voluntarily intoxicated at the time of the offenses. Accordingly, the court did not err in refusing the voluntary intoxication instructions.

(Ans., Ex. B at 7.)

Petitioner is not entitled to habeas relief on this claim because there was insufficient evidence to support the giving of such an instruction. Under the rule stated above, a criminal defendant is entitled to an instruction if the defense theory it embodies is legally cognizable, and there is evidence upon which the jury could rationally find for the defendant. See Boulware, 558 F.3d at 974. Though there is evidence that Petitioner had a cocaine dependence, the record shows little to no evidence that Petitioner was intoxicated <u>at the time of the offense</u>. The best evidence of possible contemporaneous drug use was no more than, as the prosecutor put it, "a comment about a guess as to a relapse." (Ans., Ex. G, Vol. 6 at 1014.) On this record, the Court cannot say that the state appellate court's determination of this issue was contrary to or an unreasonable application of clearly established federal law, or an unreasonable interpretation of the facts. Accordingly, Petitioner's claim is DENIED.

6

### 3. Jury Instruction on Flight

Petitioner claims that the trial court violated his right to due process when it gave a jury instruction on flight being evidence of guilt. (Pet. at 6.)

The state appellate court rejected this claim for the reasons detailed in its summary of the relevant facts:

> [Petitioner] urges that the court erred in instructing the jury with CALJIC No. 2.52, regarding flight from the crime scene. The instruction at issue stated: "The flight of a person immediately after the commission of a crime is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter of law for you to decide."
>
> "In general, an instruction advising the jury that evidence of flight alone is insufficient to establish guilt but may be considered with other proven facts in determining guilt 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.'" [Citations removed.] The jury determines the factual question of whether the defendant fled, and if so, what weight to give that determination. [Citation removed.]
>
> Here, the evidence showed that [Petitioner] left the scene of the crime. After being confronted by others who lived in the Home after Ninety was found bloodied and [Petitioner] was found holding the bloody bat, he left. He returned for his clothing, then left again. Police did not find him until approximately six hours later, when he was being attacked by a group of men. At that time [Petitioner] ignored their initial orders to "get down" and instead removed his clothes. We cannot say it would have been unreasonable to conclude that these actions, taken as a whole, "suggested" a consciousness of guilt. Moreover, the jury was instructed that it was to determine if flight occurred, and what weight to assign to that. Even if it were error to give the instruction there is no reasonable probability that a result more favorable to [Petitioner] would have been reached had it not been given.

(Ans., Ex. B at 7–8.)

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle v. McGuire, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be

judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See Estelle, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. U.S. v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)).

In the instant matter, Petitioner has not shown that he is entitled to habeas relief on this claim. Firstly, because there was evidence of flight, it was appropriate for the trial court to give a flight instruction. Secondly, the instruction protected Petitioner's due process rights in that it meticulously limited how the jury could use such evidence. Not only was the jury to determine whether Petitioner fled the crime scene, but also whether fleeing indicated guilt, and, if it was evidence of guilt, how much weight to give to that fact. Furthermore, contrary to Petitioner's assertion that the instruction lowered the prosecution's evidentiary burden (see Pet. at 22), the instruction clearly stated that evidence of flight was insufficient on its own to prove Petitioner's guilt. Rather, it was one piece of evidence to consider in light of the other proved facts. Considering this instruction itself, in the wider context of the instructions as a whole, and in the larger context of the trial record as a whole, the Court concludes that the instruction did not violate Petitioner's constitutional rights. Accordingly, this claim is DENIED.

### 4.     **Imposition of the Upper Term**

Petitioner claims that the imposition of the upper term sentence on the attempted murder conviction violated his Sixth and Fourteenth Amendment rights. (Pet. at 27.) The state appellate court did not address this claim in its written opinion.

The trial court imposed the upper term sentence of nine years for the attempted murder conviction. (Ans., Ex. A, Vol. 2 at 418.) As grounds for imposing such a sentence, the trial court found that the victim, being asleep at the time of the attack, was particularly vulnerable, which is an aggravating factor under California Rule of Court 4.421(a)(3). (Id.)

The Sixth Amendment requires that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). The "statutory maximum" discussed in Apprendi is the maximum sentence a judge could impose based solely on the facts reflected in the jury verdict or admitted by the defendant; in other words, the relevant "statutory maximum" is not the sentence the judge could impose after finding additional facts, but rather the maximum he could impose without any additional findings. Blakely v. Washington, 542 U. S. 296, 303–04 (2004). In California, the middle term is deemed the statutory maximum, and thus the imposition of the upper term, such as in the instant case, can implicate a criminal defendant's Apprendi rights. See Cunningham v. California, 549 U.S. 270, 293 (2007). In California, sentencing courts are to consider various aggravating and mitigating factors in determining whether to impose an upper term. See Cal. Rules of Court 4.421 & 4.423. A single aggravating factor is sufficient to authorize a California trial court to impose the upper term. People v. Osband, 13 Cal. 4th 622, 728 (Cal. 1996). One aggravating factor is that the "victim was particularly vulnerable." Cal. Rules of Court 4.421(a)(3).

Petitioner's upper term sentence is self-evidently erroneous under Cunningham. Specifically, the factor used by the trial court was not based on facts admitted by Petitioner or reflected in the jury's verdict, but on the trial court's independent findings. Therefore, the imposition of the upper term, thereby increasing Petitioner's sentence beyond the statutory maximum, based on the factor cited by the trial court, is unconstitutional under Cunningham.

However, Blakely and Apprendi sentencing errors are subject to a harmless error analysis. Washington v. Recuenco, 548 U.S. 212, 221 (2006). Applying Brecht v. Abrahamson, 507 U.S. 619 (1993), the Court must determine whether "the error had a substantial and injurious effect" on Petitioner's sentence. Hoffman v. Arave, 236 F.3d 523, 540 (9th Cir.2001) (internal quotation marks omitted). Under that standard, the Court must grant relief if it is in "grave doubt" as to whether a jury would have found the relevant

aggravating factors beyond a reasonable doubt. O'Neal v. McAninch, 513 U.S. 432, 436 (1995). Grave doubt exists when, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." Id. at 435.

Applying these legal principles to the instant matter, the Court concludes that the error was harmless. In sum, sufficient evidence exists in the record to support the trial court's imposition of the upper term on grounds that the victim, being asleep at the time of the attack, was particularly vulnerable. Under California law, finding a victim particularly vulnerable, "[p]articularly . . . means in a special or unusual degree, to an extent greater than in other cases." People v. Loudermilk, 195 Cal.App.3d 996, 1007 (Cal. Ct. App. 2008) (internal citations and quotation marks removed). "Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act." (Id.) To this Court, it was reasonable for the trial court to find that a sleeping victim is "unguarded, unprotected, accessible." In fact, California appellate courts have found that sleeping makes a victim particularly vulnerable. See People v. Orr, No. 2008 WL 771506 at *5 (Cal. Ct. App. Mar. 25, 2008). On such evidence, and in light of the highly deferential AEDPA standard, the Court does not have "grave doubts" as to whether a jury would have found the relevant aggravating factor beyond a reasonable doubt, and, accordingly, the Court must deny Petitioner habeas relief on his sentencing claim.

### 5. Sanity Determination

Petitioner claims that there was insufficient evidence to support a finding that he was sane at the time the crime was committed. (Pet. at 8.)

At the sanity phase of the trial, the jury determined that Petitioner was sane at the time of the commission of the offenses. (Ans., Ex. B at 2.) The state court summarized the relevant facts and its decision on the issue as follows:

> [Petitioner] maintains that no substantial evidence supported the jury's finding that he was sane at the time of the offenses. He argues that the testimony of both psychologists, that they believed he was incapable of distinguishing right from wrong or knowing or understanding the nature and quality of his act at the time of the offenses, was uncontroverted.

> Section 25, subdivision (b) sets forth the law on the defense of insanity. "In any criminal proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." (§ 25, subd. (b).) A "party claiming that any person, including himself, is or was insane has the burden of proof on that issue." (Evid. Code, § 522.)
>
> It was undisputed that [Petitioner] had suffered for years from a mental illness, paranoid schizophrenia. Mental illness alone, however, is not sufficient to establish an insanity defense under section 25. [Petitioner] also had the burden of proving that he was incapable of knowing or understanding the nature and quality of his act, or that he was incapable of distinguishing right from wrong at the time he committed the offense. While Drs. Griffith and Hoey both testified to their opinions that [Petitioner] met the legal definition of insanity, the jury could choose to disbelieve them or reject their opinions in this regard, and they were so instructed. [Citation removed.] Both psychologists interviewed [Petitioner] approximately one year after the incident. Both read the transcript of [Petitioner]'s police interview after making their initial determination of insanity, but neither listened to the tape, and neither said it affected their opinion. The trier of fact is entitled to rely only "on the evidence it deem[s] most credible." [Citation removed.]
>
> The testimony of Sergeant Dunakin and the taped interview of [Petitioner] supported the jury's determination. In the interview, [Petitioner] denied any involvement in the incident, and denied knowing King Ninety. He told police he had not been at the Home, but had spent the night at his Aunt Tootsie's house. When Sergeant Dunakin pointed out the blood on his sweatpants, [Petitioner] first said it was not blood, then stated it could be from falling in some bushes or an infection. [Petitioner]'s demeanor was calm at the beginning of the interview. He seemed to understand, and answered Sergeant Dunakin's questions. He became hostile and aggressive when the questions became accusatory. Notably, at the end of the interview, [Petitioner] stated that he knew "nothing" about the attack, but asked to see what evidence the police had implicating him. The jury listened to the audiotape during the sanity phase of the trial, and was able to consider [Petitioner]'s attitude, manner and tone, and the fact that he made these statements to police shortly after he committed the offense. The jury could reasonably conclude that [Petitioner]'s statements claiming he did not know King Ninety, had been at his Aunt Tootsie's home the night of the attack, and giving other explanations for the blood on his pants, were inconsistent with either an inability to know or understand the nature and quality of his act, or with an inability to distinguish right from wrong at the time.

(Ans., Ex. B at 8–10.) The Court notes that Simul and Brooks, Petitioner's roommates, both of whom saw Petitioner holding a bloody bat after the attack on the victim, stated to investigators that they heard Petitioner say that he believed the victim had shot him on a previous occasion. (Id. at 3, 4.)

11

United States District Court
For the Northern District of California

Petitioner has not shown that he is entitled to habeas relief on this claim. Firstly, Petitioner has not shown that his claim is cognizable on federal habeas review. To put this with more specificity, Petitioner has not shown that he can base a federal constitutional claim on alleged evidentiary deficiencies at his sanity determination. This is not to say that an accused has no clearly established federal constitutional protections related to a sanity determination. For instance, the accused, upon a suitable showing that his sanity at the time of the offense is to be a significant factor at trial, has a right of access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. See Ake v. Oklahoma, 470 U.S. 68, 83 (1985). However, this right extends to access to a psychiatrist, not to have access to a favorable opinion by the psychiatrist. See Pawlyk v. Wood, 248 F.3d 815, 823 (9th Cir. 2001). An accused also has Sixth Amendment protections when he submits to a psychiatric evaluation that is later used against him. Buchanan v. Kentucky, 483 U.S. 402, 424–25 (1987). While these constitutional protections are clearly established, Petitioner has not shown that he has a cognizable federal claim for alleged evidentiary deficiencies at his state sanity determination.

Secondly, even if such Petitioner had shown that his claim is cognizable, such claim would not succeed. The nearest legal analog to Petitioner's claim is that of insufficient evidence to support conviction on the charges beyond a reasonable doubt. Federal habeas relief can be granted on such a claim only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 324 (1979). Applying this rule by analogy to Petitioner's claim, the Court concludes that the state appellate court's determination on this issue did not result in a decision that was contrary to or an unreasonable application of clearly established federal law. Evidence was presented upon which a rational juror could find that Petitioner had not met his burden to prove his lack of sanity. Specifically, the jury may have found Petitioner's explanation of the blood on his clothing wanting, and may have rejected as implausible his statement that he did not know

the victim, a man with whom he lived. Petitioner's having told several persons that he believed the victim had shot him on previous occasions could also have provided the jury evidence that Petitioner was sane, and that his killing was motivated by revenge, rather than by insanity. That the psychologists' interviews occurred a year after the crime may have weighed against their accuracy. On such a record, the Court cannot say that a reasonable juror would not have found Petitioner sane. Accordingly, Petitioner's claim is DENIED.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. The state court's adjudication of the claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner has filed a motion inquiring into the procedural status of this action. (Docket No. 15.) As this order answers Petitioner's inquiry, his motion is DENIED.

Petitioner's request for an evidentiary hearing, which he filed as part of his traverse, see Docket No. 13, is DENIED as moot.

This order terminates Docket No. 15.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals.

The Clerk shall enter judgment in favor of Respondent, terminate all pending motions, and close the file.

**IT IS SO ORDERED**.

DATED: 2/24/2010

MARILYN HALL PATEL
United States District Judge

**NOTES**

1. The jury convicted Petitioner of mayhem, see Cal. Pen. Code § 205, attempted murder, see id. §§ 664/187, and aggravated assault, see id. § 245(a)(1). The jury also found true allegations that Petitioner used a deadly weapon in the attempted murder, see id. § 12022(b)(1), and personally inflicted great bodily injury with respect to the attempted murder and aggravated assault charges, see id. § 12022.7(b). (Ans., Ex. B at 2.)

2. The court found true that Petitioner had six prior felony convictions, one prior strike and one prior prison term. See Cal. Pen. Code §§ 667(a)(1), (e)(1), 1170.12(c)(1), 667.5(b). (Ans., Ex. B at 2.)